RECEIVED

SEP 2 9 2015

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

LATRINA D. THOMAS

-vs-

CITY OF WINNFIELD, et al.

CIVIL ACTION NO. 1:08-cv-1167

JUDGE DRELL

MAGISTRATE JUDGE KIRK

## RULING

Pending before the Court are the following questions: (1) whether all claims against Defendant Scott Nugent should be dismissed as a result of Nugent's bankruptcy discharge (see Doc. 300); (2) reconsideration of our previous ruling denying dismissal of Defendant Nugent on the basis of qualified immunity (Doc. 246) in light of the United States Supreme Court's decision in this case (Doc. 279) and subsequent remand by the United States Court of Appeals for the Fifth Circuit (Doc. 281); and (3) a motion to dismiss all claims against Defendant Cargle Branch as a result of Mr. Branch's discharge in bankruptcy. (Doc. 311). We have reviewed the record and considered the arguments raised in the parties' briefs, letters, and oral arguments. For the following reasons: (1) Dismissal of Defendant Nugent will be **DENIED**; (2) our previous ruling (Doc. 246) that Nugent is not entitled to qualified immunity will stand and his motion for summary judgment (Doc. 156) as to that issue will remain **DENIED**; and (3) Defendant Branch's motion to dismiss (doc. 311) will be **DENIED**.

## I.    Background

Winnfield Police Officers Scott Nugent and Cargle Branch were on patrol in separate cars when Nugent spotted Byron D. Pikes, who Nugent believed to have an outstanding arrest warrant. (Doc. 150-5 at 2). When the officers told Pikes they needed to speak with him, he responded that he had nothing to say and took off running (Docs. 150-5 at 3, 198-1 at 8). The officers chased Pikes for three minutes into a wooded area where Branch aimed his firearm at Pikes and ordered him to the ground, with which order he complied. (Doc. 150-5 at 4). The officers then handcuffed Pikes and ordered him to stand up. Id. at 5. At this time, Pikes was not hostile or threatening to the officers, but, for whatever reason, did not comply with the order. (Docs. 150-5 at 5; 198-1 at 8). Nugent told Pikes he had until the count of three to get up or Nugent would electroshock him with his Taser X26 ECD. (Doc. 150-5 at 5).

After Pikes did not stand up, Nugent took his Taser device, in drive stun mode,[1] and administered a six-second electroshock to Pikes in the center of his back. (Doc. 150-5 at 6). When the device came out of contact with Pikes, the probes deployed at point blank range into Pikes' back. Id. Pikes got up, walked about ten feet, and fell to his knees. Id.   Nugent then administered a second, five-second, electroshock to the center of Pike's back. Id. Pikes still did not get up, so Nugent shocked him a third time. Id. at 7. After the third shock, Pikes fell forward and lay on

---

[1] According to Taser International, the Taser X26 ECD has two modes of deployment: (1) drive stun mode and (2) probe shots. In drive stun mode, a current of approximately 50,000 volts passes between two electrodes, 1.6 inches apart, on the tip of the device. The officer presses the device directly in contact with the body of the officer's intended target causing pain. This mode is generally used for "pain compliance" much like hitting someone with a baton to get them to do what you want. In Probe mode, two probes are ejected from the device toward the intended target at slightly different angles. If done correctly, the probes will stick into the target's body, and an electrical current will pass through the target's body (a closed circuit with the Taser device) causing muscle constriction and temporary paralysis. (See Doc. 150-5 at 15-17).

the ground. Id. Nugent then shocked Pikes a fourth time in the center of the back. Id. Plaintiff's and Defendants' stories begin diverging more at this point. Plaintiff alleges that Nugent and Defendant Marsdin dragged Pikes across a parking lot to a concrete barrier. (Doc. 198-1 at 9-10). Defendants say that Pikes walked to the concrete barrier and lay down on it telling the officers "to leave him there so he could die." (Doc. 150-5 at 7-8). In either event, Nugent shocked Pikes two more times while he lay on the concrete barrier. Id. at 8. Defendants contend that Pikes then got up and walked with the officers' help (falling down a few times) to Branch's car. Id. at 9. Plaintiff contends Pikes was "incapacitated" and "limp" at this point and "somehow was placed in [Branch's car]" with the obvious implication that he was dragged. (Doc. 198-1 at 10).

In the squad car, Pikes either told Branch, "I'm dead anyway. I'm dead anyway" (Defendants' version, doc. 150-5 at 9) or "I'm going to die. I'm going to die" (Plaintiff's version doc. 198-1 at 10). En route to the police station, Branch drove past the Winn Parish Medical Center (forming part of the basis for Plaintiff's claim against Branch for deliberate indifference to Pikes' medical needs). (Doc. 198-1 at 10; see also Doc. 1). After arriving at the station, the officers told Pikes, who was still handcuffed in the backseat of Branch's car, to get out of the vehicle. (Doc. 150-5 at 10). After Pikes could not or would not get out, Nugent electroshocked Pikes in his chest.[2] Nugent then pulled Pikes from the vehicle and Pikes fell to the pavement. (Doc. 198-1 at 11; see also 150-5 at 10). Defendants contend Nugent shocked Pikes again while he was on the ground (the eighth time) and Plaintiff contends Nugent shocked Pikes twice (for a total of nine electroshocks). (See Docs. 150-5 at 11; 198-1 at 11). In either

---

[2] All parties agree Nugent shocked Pikes in the chest. Defendants contend it was closer to the shoulder, doc. 150-5 at 10, while Plaintiff contends it was closer to Pike's heart, doc. 198-1 at 11.

event, Pikes was nonresponsive at this point, and the officers dragged him into the station. (Doc. 150-5 at 11).

In the station, the officers put Pikes in a chair, but he kept falling out. Id. at 12. According to Defendants, Nugent called for an ambulance when Pikes said he had asthma and was "kind of breathing kind of heavy." Id. at 12. According to Plaintiff, Nugent called for an ambulance because Pikes began having a seizure with "a stream of white stuff start coming out of his mouth and his head and body flop[ping]." (Doc. 198-1 at 12). Notably, the EMTs' report says, "Called to PD pt down after being tazzed [sic] by Pd." (Doc. 198-4 at 1). Pikes was non responsive to EMTs who applied a sternum rub, placed heart monitor leads and blood pressure cuffs, and, upon finding no pulse, began cardiopulmonary resuscitation (CPR). (Doc. 150-5 at 13). EMTs then transported Pikes to the hospital with Nugent driving the ambulance. Id. at 14. The nurses' notes indicate Pikes arrived at 14:35 and was "cold to touch." (Doc. 198-4 at 7). After unsuccessful attempts to revive Pikes, he was pronounced dead. (Doc. 150-5 at 14; Doc. 198-1 at 12).

## A.    Procedural History

This case has a long and complicated procedural history, much of which has been covered in previous rulings, but we will briefly recount how these three issues came to be extant. Latrina Thomas, Mr. Pikes' surviving spouse, originally brought suit against Officer Nugent, Officer Branch, and other defendants in August 2008 (Doc. 1). Officer Branch filed for bankruptcy in March 2009 and, in February 2010, we granted Branch's motion to stay the proceedings (doc. 79) because of his pending Chapter 13 bankruptcy. After Defendant, Taser International, sought the necessary

4

leave from the bankruptcy court, we lifted the stay as to all the defendants except Branch. (See docs. 97, 98).

In April 2012, we granted, in part, Nugent's motion for summary judgment, but denied the motion as to his request for qualified immunity. (Doc. 246). In October 2013, the United States Court of Appeals for the Fifth Circuit reversed our denial of qualified immunity, and, pursuant to its instructions to us, we entered a revised judgment dismissing all claims against Nugent. (See Docs. 273, 276). However, in May 2014, the United States Supreme Court vacated the Fifth Circuit's judgment and remanded the case to the Fifth Circuit for further consideration in light of Tolan v. Cotton, 134 S.Ct. 1861 (2014). (Doc. 279); Thomas v. Nugent, 134 S.Ct. 2289 (2014). Subsequently, we vacated our revised judgment dismissing the claims against Nugent, which was previously ordered at the Fifth Circuit's request. (Doc. 276). The Fifth Circuit Court then further remanded the case to us to reconsider the issue of qualified immunity in light of the Supreme Court's recent Tolan decision. This reconsideration is now pending.

As we were preparing to rule on the remanded qualified immunity issue in November 2014, Nugent's attorney, Randall Keiser, brought to our attention the fact that, nearly a year earlier, Nugent had also filed for bankruptcy under Chapter Seven of the Bankruptcy Code and received a discharge in July 2014. (See doc. 300). Because of the unusual nature of the situation, we then asked the parties to brief the issue of whether Nugent's discharge in bankruptcy prevented Plaintiff from continuing to prosecute her claims against him in this case. We also became aware that Branch had successfully completed his repayment plan and received a discharge

in his Chapter 13 bankruptcy case. In February 2015, we held a hearing to show cause why all claims against Nugent and Branch should not be dismissed as a result of their respective bankruptcy discharges.

## II.     Law and Analysis

As we said, there are three matters currently pending: (1) whether all claims against Defendant Scott Nugent should be dismissed as a result of Nugent's bankruptcy discharge (see Doc. 300); (2) reconsideration of our previous ruling denying dismissal of Defendant Nugent on the basis of qualified immunity (Doc. 246) in light of the United States Supreme Court's decision (Doc. 279) and subsequent remand by the United States Court of Appeals for the Fifth Circuit (Doc. 281); and (3) a motion to dismiss all claims against Defendant Cargle Branch as a result of Mr. Branch's discharge in bankruptcy. (Doc. 311). We address each of these in turn.

### A.     Dismissal of Claims against Scott Nugent

On November 25, 2014, counsel for Scott Nugent hand delivered a letter to the Court informing us that Nugent had filed for bankruptcy in January 2014 and had received a discharge of all of his debts in July 2014. (Doc. 300). We were totally unaware of even the existence of that bankruptcy proceeding.  Counsel for Nugent claims he was also entirely unaware of his client's actions until just before November 25, 2014. Likewise, Plaintiff claims she and her attorney were unaware of Nugent's bankruptcy until well after the discharge was final. (Docs. 301, 307).

In opposing dismissal of Defendant Nugent, Plaintiff contends that Nugent's debt to the Plaintiff was not discharged in bankruptcy, first, because the debt was not properly scheduled by Nugent, the debtor, in his bankruptcy petition. Plaintiff

also contends that Nugent's debt to the Plaintiff is "for willful and malicious injury" and, thus, is nondischargeable under 11 U.S.C. § 523(a)(6). Finally, Plaintiff argues in the alternative that, even if the debt were discharged, Plaintiff can still proceed nominally against Nugent in order to recover from another entity. (See doc. 301).

In a bankruptcy case, "[t]he debtor shall file a list of creditors." 11 U.S.C. § 521(a)(1). A discharge of debt by the bankruptcy court does not discharge any debt that was not properly listed or scheduled with the name of the creditor. See 11 U.S.C. § 523(a)(3)(B). Listing the creditor and the creditor's address on the bankruptcy petition is a strict requirement, which is not satisfied by listing the creditor's attorney or attorney's address.[3] Improperly scheduling the creditor's attorney or attorney's address instead of the creditor's may only be cured by showing that the creditor otherwise had notice or actual knowledge of the bankruptcy. Id. An

---

[3] See In re Barnes, 326 B.R. 832, 838 (Bankr. M.D. Ala. 2005) ("[T]he question [is] whether [debtor] properly scheduled [creditor], according to Rule 1007, Fed. R. Bankr.P., where he listed only his lawyer's address and not [his client]'s address. Rule 1007(a) provides, in part, that: 'In a voluntary case, the debtor shall file with the petition a list containing the name and address of each creditor unless the petition is accompanied by a schedule of liabilities.' Moreover, the form for the schedule of liabilities prescribed by the Judicial Conference of the United States, calls for the "Creditor's Name, mailing address including zip code, and account number." Listing an attorney's name and address does not meet the requirements of Rule 1007. Moreover, courts which have considered this question have found that listing an attorney but not the creditor himself, does not comply with the rules."); In re Hutchinson, 187 B.R. 533 (Bankr. S.D. Tex. 1995) ("[T]he petitioner shall file a mailing list of creditors showing their complete names and addresses, including zip codes. The rules make no mention of scheduling creditors at the address of their last known attorney."); In re Lyman, 166 B.R. 333, 335 (Bankr. S.D. Ill. 1994) ("Proper scheduling requires the correct name and address of creditors on the debtor's schedules and lists."); In re Kouterick, 161 B.R. 755, 758 (Bankr.D.N.J.1993) ("Rule 1007(a)(1) provides that the debtor shall file a list containing the names and addresses of each creditor; no mention is made of attorneys."); In re Horton, 149 B.R. 49, 60 (Bankr.S.D.N.Y.1992) ("[T]he Bankruptcy Code and Rules only require that notice be sent to the creditor, not to a creditor's counsel even if that counsel is known."); In re Szczepanik, 146 B.R. 905, 912 (Bankr. E.D.N.Y. 1992) ("[t]he Bankruptcy Rules require a debtor's schedule to list 'the name and address of each creditor.' An attorney's name is not an address. [The fact that the attorney] represented the creditors in another court in connection with other matters did not make him the proper party to receive notice of the proceedings in the bankruptcy case."); In re Fauchier, 71 B.R. 212, 215 (B.A.P. 9th Cir. 1987) ("An attorney who has represented a creditor in state court proceedings does not, by virtue of that relationship alone, represent the creditor with respect to that same debt in a federal bankruptcy proceeding."); In re Gelman, 5 B.R. 230, 232 (Bankr. S.D. Fla. 1980) ("Among the duties of a debtor in availing himself of the benefits of bankruptcy, is that of properly listing his creditors, including addresses.").

attorney's actual notice (but not constructive notice) of the pendency of the bankruptcy *may* be imputed to the client only if it occurs within the scope of the attorney-client relationship. In re Hutchinson, 187 B.R. 533, 536 (Bankr. S.D. Tex. 1995).

The facts of In re Hutchinson are worth recounting here given their remarkable similarity to the case at hand. The creditor there filed suit in state court against the debtor to collect bad debt on an account receivable. Id. at 534. Later, the debtor filed a Chapter 7 petition in bankruptcy court in which the debtor scheduled his debt to the creditor "with its name in care of [the creditor's] attorney in the state court lawsuit and did not otherwise notify [the creditor] of the pending bankruptcy." Id. The creditor did not dispute the accuracy of the attorney's address on the petition or claim that the attorney had ever moved offices, but did contend that the attorney had not received any notice of bankruptcy.[4] Id. at 535. In the interim, the lawsuit in state court continued to be processed as neither the court itself nor either party's attorneys seemed to be aware of the pending bankruptcy. Id. When the creditor's attorney received and reviewed a Trustee's Notice of Hearing, the creditor sought to file a late complaint challenging the dischargeability of the debt. Id.

The bankruptcy court found that the debtor had improperly scheduled his debt to the creditor, in violation of the requirements of 11 U.S.C. § 521(a), by listing the debt in care of the creditor's attorney with the attorney's address. Id. When a bankruptcy court discharges a debt, it affects the property rights of that creditor.

---

[4] "[The creditor's] attorney urges that he did not receive the Court's Notice of Commencement of Case Under Chapter 7 of the Bankruptcy Code, Meeting of Creditors, and Fixing of Dates (Notice of Commencement of Case)." In re Hutchinson, 187 B.R. at 535.

Consequently, the Due Process Clause of the U.S. Constitution affords the creditor the right to notice and an opportunity to be heard before those property rights can be taken away by the bankruptcy court. See id. at 536. By failing to properly schedule the debt with the name and address of the actual creditor (or an agent designated by the creditor for service of process), the debtor failed to notify the creditor directly of the pending bankruptcy proceeding. Id. Furthermore, the constructive notice to the creditor's attorney (i.e., the mailings from the bankruptcy court) did not constitute notice to the creditor. Id. To be imputed to the creditor, the creditor's attorney would need to have had *actual knowledge* (not constructive knowledge) of the bankruptcy, *and* he would need to have acquired that knowledge within the scope of the attorney-client relationship. See id.

The bankruptcy court ultimately found that, despite evidence of several mailings from the bankruptcy court, the creditor's "state court attorney had no actual notice or knowledge of debtor's bankruptcy. Indeed, there was nothing to even incite inquiry on his part." Id. Furthermore, even if the attorney had actual notice, this still would not necessarily be imputable to the creditor because "an attorney's representation of a party in one action does not make the attorney an agent for the party in an unrelated case between the same parties." Id. (quoting Maldonado v. Ramirez, 757 F.2d 48, 51 (3rd Cir. 1985)).

In the instant case, Nugent originally failed to list his debt to the Plaintiff on Schedule F of his Chapter 7 bankruptcy petition, and, when he amended his petition after the Meeting of Creditors, he listed "Carol D. Powell Lexing" (Plaintiff's attorney in this litigation) as the creditor along with the address of Ms. Lexing's law office. As

was the case with <u>In re Hutchinson</u>, there is no question that the debtor (here, Nugent) did not notify the creditor (here, Latrina Thomas, tutrix on behalf of her minor son, KaDaryan Da'Shun Thomas) of the bankruptcy. Ms. Thomas has filed a sworn affidavit with this Court attesting to the fact that she did not learn of the bankruptcy until November 2014. (Doc. 307). Nugent failed to schedule his debt properly with the name and address of his creditor, Ms. Thomas, in violation of 11 U.S.C. § 501(a).

Our findings as to whether any notice to Ms. Lexing may be imputed to Ms. Thomas are also in line with <u>In re Hutchinson</u>. We note, first of all, that Nugent failed to list his debt to Ms. Thomas on his original petition filed on January 9, 2014. Nugent amended his petition, to add Ms. Lexing as a creditor, on May 29, 2014, which was after the Meeting of Creditors had been held and only a few weeks before Nugent received his final discharge of debt on July 2, 2014. Therefore, the majority of mailings from the bankruptcy court would have never been sent to Ms. Lexing.[5]

Ms. Lexing asserts in a sworn affidavit that she did not learn of the bankruptcy until November 25, 2014 when she received a letter from Nugent's counsel of record in this suit. (Doc. 301-4). That letter, we should note, was one in which Nugent's

---

[5] The record indicates that the only mailing from the bankruptcy court sent to Ms. Lexing was the July 2, 2014 Discharge Order. (<u>See</u> doc. 301). However, Ms. Lexing filed a sworn affidavit with this Court indicating that she moved her law office to a new address on June 23, 2014 and thus would not have received that mailing (Doc. 301-4). The only notice of the bankruptcy Ms. Lexing may have received is a copy of the amended petition that Nugent's bankruptcy attorney mailed to her office prior to the move. However, Ms. Lexing alleges in her affidavit that she never received the amended petition. (Doc. 301-4). Nugent directs our attention to the certificate of service attached to his May 29, 2014 amended petition indicating that a copy of the amended petition was mailed to Ms. Lexing. Additionally, Nugent has filed an affidavit from C. Rodney Harrington, his bankruptcy attorney, attesting to the fact that Mr. Harrington mailed a copy of the amended petition to Ms. Lexing (before she moved offices three weeks later). (Doc. 308). However, this is only evidence that the documents were mailed, and not that they were delivered, received, or read. It is, at best, evidence of constructive knowledge of the bankruptcy by Ms. Lexing, which cannot be imputed to Ms. Thomas.

attorney, Randall Keiser, informed the Court that, unbeknownst to him, his client had gone out, filed for, and received the Chapter 7 bankruptcy discharge under just about everybody's nose. (See Doc. 300). Nugent's bankruptcy attorney did not even bother to notify this court of Nugent's bankruptcy via a "Suggestion of Bankruptcy on the Record," which would have stayed the proceedings here. Instead, not only did this litigation continue here as was the case in In re Hutchinson, but Nugent's and the Plaintiff's attorneys took trips to the Fifth Circuit Court of Appeals **and** to the U.S. Supreme Court all while these proceedings should have been stayed.

Needless to say, since we were also kept in the dark, we have no trouble believing that Ms. Lexing was unaware of Nugent's bankruptcy. We find that Ms. Lexing did not have actual notice or knowledge of the pendency of Nugent's bankruptcy. Furthermore, the mere fact that Ms. Lexing is the attorney for Ms. Thomas in this case does not make her Ms. Thomas' agent in an unrelated case involving both parties. See In re Hutchinson, 187 B.R. at 536. Because Nugent did not properly list or schedule his debt to Ms. Thomas and she did not otherwise have notice or actual knowledge of the bankruptcy case, we find that Ms. Thomas' claim against Nugent **was not discharged** by the July 2, 2014 Discharge Order. See 11 U.S.C. § 523(a)(3).[6]

---

[6] It appears to us that the applicable subsection is 523(a)(3)(B), because Plaintiff argues the debt would not have been dischargeable under § 523(a)(6), but she did not have notice to timely file a request for determination of dischargeability. Nugent's claims that we do not have jurisdiction to make such a determination is unfounded. See In re Fields, 203 B.R. 401, 402 n.1 (Bankr. M.D. La. 1996) ("The effect of the failure timely to notify a creditor holding a right under section 523(a)(6) [the "willful or malicious injury" exception] is the evaporation of the deadline established by section 523(c) by which the creditor must bring the complaint. As well, the requirement that the complaint be filed with the bankruptcy court disappear, with the creditor obtaining an expansion of jurisdiction so that state courts have the concurrent authority to entertain the dischargeability action.").

Mr. Nugent contends that the bankruptcy court has exclusive jurisdiction to resolve this issue. Plaintiff responds that, while the Bankruptcy Code reserves exclusive jurisdiction to the bankruptcy court for determining whether a debt is dischargeable under the "willful and malicious injury" exception, it does not exclusively do so for the exception to discharge for claims that are not properly scheduled or listed by the debtor. Compare 11 U.S.C. § 523(a)(6) and § 523(a)(3)(B). Essentially, Defendant's failure to properly schedule the debt voids the exclusive jurisdiction of the Bankruptcy Court to adjudicate the dischargeability of the debt. See In re Fields, 203 B.R. 401, 402 n.1 (Bankr. M.D. La. 1996) ("The effect of the failure timely to notify a creditor holding a right under section 523(a)(6) [the "willful or malicious injury" exception] is the evaporation of the deadline established by section 523(c) by which the creditor must bring the complaint. As well, the requirement that the complaint be filed with the bankruptcy court disappears, with the creditor obtaining an expansion of jurisdiction so that state courts have the concurrent authority to entertain the dischargeability action."). If this rule applies to state courts, it must also apply in a federal district court. Thus, Nugent's contention falls.

Mr. Nugent also contends he did not commit "willful or malicious injury" because he did not intend to cause Mr. Pike's death. His argument is based almost entirely on one sentence (from which he further extrapolates) from Kawaauhau v. Geiger: "The word 'wilfull' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." 523 U.S. 57, 61 (1998) (emphasis omitted). Mr. Nugent asserts, "[t]he injury at issue in this case is not that of one or more temporary

moments of pain resulting from the non-lethal use of a taser . . . but rather the death of Mr. Baron Pikes" (Doc. 308 at 15). If the "injury" is death, Defendant Nugent argues that Plaintiff must prove he, Nugent, intended the death of Mr. Pikes in order to fall within the section 523(a)(6) exception. Mr. Nugent is apparently suggesting that the only way the bankruptcy exception would apply to him is if Plaintiff can prove he murdered Mr. Pikes.

Mr. Nugent, however, misreads Kawaauhau. There, the Supreme Court rejected the very broad interpretation, proposed by one of the parties, of the 523(a)(6) exception that would have swept in "a wide-range of situations in which an act is intentional, but the injury is unintended . . . for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic." Kawaauhau, 523 U.S. at 62. Rather, the Court made clear that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" Id. at 61-62 (emphasis omitted). The question, thus, is not whether Mr. Nugent intended to kill Mr. Pikes, but, rather, whether "there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor [Mr. Nugent]." In re Williams, 337 F.3d 504, 509 (5th Cir. 2003) (quoting In re Miller, 156 F.3d 598, 606 (5th Cir.1998)).

As this case remains pending and no judgment has been rendered by the Court, the viability of Nugent's debt to Ms. Thomas is uncertain. If Nugent is found not liable to Ms. Thomas, then all of these bankruptcy issues become moot. However,

given the claims asserted against Nugent (particularly excessive force and assault and battery), it appears that the resulting debt from such judgment would be nondischargeable under 11 U.S.C. § 523(a)(6) anyway. Consequently, we cannot find that, now, as a matter of law, Nugent is entitled to the dismissal of the claims against him for this reason.

### B.   Reconsideration on Remand of Our Previous Ruling that Nugent is Not Entitled to Qualified Immunity

As we noted earlier, this issue was remanded by the Supreme Court to the Fifth Circuit Court in May of 2014, and subsequently remanded to us by the Fifth Circuit Court in July of 2014. (Docs. 279, 281).  In those orders of remand, we were instructed to consider Defendant Nugent's qualified immunity motion for summary judgment in light of the Supreme Court decision Tolan v. Cotton, 134 S.Ct. 1861 (2014).

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Specifically, in resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. Tolan v. Cotton, 134 S.Ct. 1861, 1865 (2014). First, a court asks "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). The second prong "asks whether the right in question was 'clearly established' at the time of the violation." Tolan, 134 S.Ct. at 1865 (citing Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  However, courts have discretion to decide

the order in which to resolve these questions.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

In Tolan, the Supreme Court emphasized that "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." 134 S.Ct. at 1866.  This is not a rule specific to qualified immunity, but an application of the rule that a "'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). See also Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983) (stating that courts are to consider all "evidence in the light most favorable to the party resisting the motion").   A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

As we noted in our previous ruling, Mr. Pikes' words and actions during his encounter with Officer Nugent are genuinely disputed. (Doc. 246 at 28–29). There is competent evidence suggesting that Mr. Pikes was physically unable to comply with Officer Nugent's commands and that he was yelling in pain and asking for help. Id. On the other hand, Officer Nugent contends that Mr. Pikes was passively resistant and was only yelling that he did not want to go to jail. Id. Consistent with the Supreme Court's instruction in Tolan and considering the evidence in light most favorable to Plaintiff, the nonmoving party here, it would be improper for us to resolve these disputed issues in favor of Officer Nugent. See Tolan, 134 S.Ct. at 1867–

68.  Thus, we again find that a number of genuine disputes of material fact exist in this case.

In light of the genuine disputes of material fact as to Mr. Pikes' behavior, we conclude a jury could find that Officer Nugent's use of force was not objectively reasonable under clearly established law. Consequently, our original Ruling (Doc. 246) stands and Nugent's summary judgment on this issue is **DENIED**.

### C.      Motion to Dismiss Claims against Cargle Branch

As noted earlier in this ruling, Branch did timely notify this Court of his bankruptcy case and requested a stay in the proceedings against him. Now that Branch has completed his repayment plan and received a discharge under Chapter 13 of the Bankruptcy Code, he seeks to have Plaintiff's claims dismissed because any debt resulting from a judgment against him has already been discharged and could not be recovered from him by Ms. Thomas. (Doc. 311). Plaintiff has opposed Branch's motion to dismiss on two grounds: (1) Branch's debt to Ms. Thomas was not, in fact, discharged under 11 U.S.C. § 1328(a) and (2) even if Branch's debt to Ms. Thomas has been discharged, Ms. Thomas may still maintain her suit against Branch nominally in order to receive a judgment that may be executed against another entity to the extent Branch is insured or indemnified. (Doc. 318).

### 1.      Whether Branch's Debt Was Nondischargeable

As to Plaintiff's first argument, she offers very little support for her two positions: (1) debts for willful or malicious injuries are automatically exempt from discharge and (2) she was not required to first bring her claim in the bankruptcy

court. Her arguments rests almost entirely on an analysis of 11 U.S.C. § 1328(a)(4) and 11 U.S.C. 523(a)(6), which was fairly thin and unconvincing.[7]

However, the case law illustrates that the big difference between debts for willful and/or malicious injury is that such debts are dischargeable in Chapter 13 but are not dischargeable in Chapter 7. For example, in In re Caldwell, the 6th Circuit stated, "[w]e begin with the proposition that a debt which follows a 'willful and malicious injury' cannot be discharged under Chapter 7 of the Bankruptcy Code. But such a debt can be discharged under Chapter 13, which allows the debtor to repay his obligation over time from his disposable income." 895 F.2d 1123, 1126 (6th Cir. 1990) (citations omitted). The 6th Circuit further emphasized that, because of this difference, the debtor needs to demonstrate that the proposed plan has been made in good faith (and is not merely a veiled Chapter 7 liquidation). Id. The debtor need only show good faith in proposing the plan, not in incurring the debt. See In re Hamade, No. 11-68553, 2013 WL 663736, at *5 (Bankr. E.D. Mich. Feb. 15, 2013).[8]

Determining whether the debtor acted in good faith or bad faith is a fact intensive inquiry. See In re Johnson, 191 B.R. 179, 182–83 (Bankr. D. Ariz. 1995). Where a creditor has alleged willful or malicious injury in its ongoing lawsuit against the creditor and the payment to unsecured creditors is very small, a court could

---

[7] Plaintiff argued that, under Chapter 13 of the Bankruptcy Code, the exception applies to a "willful *or* malicious injury" as opposed to Chapter 7 of the Bankruptcy Code, which applies to a "willful *and* malicious injury." (Doc. 318).

[8] In that case, the bankruptcy court stated: "In Chapter 13 bankruptcy, debtors often seek to discharge debts stemming from their willful and malicious acts. Yet courts do not find that all such Chapter 13 plans are lacking in good faith. A debt that follows a willful and malicious act can, in fact, be discharged through a Chapter 13 bankruptcy. However, 'Courts should not approve Chapter 13 plans which are nothing more than 'veiled' Chapter 7 plans.' Also, it is important to distinguish between bad faith in incurring the debt and bad faith in proposing the bankruptcy plan. The Court rejects the notion that a Chapter 13 plan is, perforce and for that reason alone, lacking in good faith simply because the underlying debt was incurred in a willful and malicious manner." (Citations omitted).

conclude that such a bankruptcy is a veiled Chapter 7 case. Id. at 182. Additionally, "where wilful [sic] and malicious injury is combined with an absence of legitimate other creditors, a plan that offers minimal repayment, and a filing timed just prior to a crucial proceeding in another court, bankruptcy courts have found bad faith on the part of debtors." Id. at 183.

Here, Branch followed proper procedure to effect a Chapter 13 bankruptcy.[9] The bankruptcy court eventually approved his repayment plan finding that it had been made in good faith. Ms. Thomas never challenged this in Branch's bankruptcy case or made a request to convert the bankruptcy to a Chapter 7 case in which the debt to Ms. Thomas may not have been dischargeable. Consequently, we find that Branch's debt, if any, was properly discharged.

## 2. Whether Plaintiff May Proceed Nominally against Branch

A discharge in bankruptcy normally relieves the debtor from the obligation to pay the debt, but does not extinguish the debt or relieve any other entity from the obligation to pay the debt. 11 U.S.C. § 524(e); In re Edgeworth, 993 F.2d 51, 53 (5th Cir. 1993) ("A discharge in bankruptcy does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt. Section 524(e) specifies that the debt still exists and can be collected from any other entity that might be liable."). Where a tort creditor has a valid judgment against a debtor who thereafter receives a bankruptcy discharge, Section 524(a) prevents the creditor from executing the judgment against the debtor personally, but Section 524(e) allows the creditor to

---

[9] Branch also failed to properly schedule Latrina Thomas as his creditor, but in this case there was actual notice—Branch informed this Court of his bankruptcy and sought a stay in the case pending the bankruptcy proceedings.  There is also evidence in the record of communications with Ms. Lexing about Branch's bankruptcy. Thus, the issue of failure to properly schedule that is present regarding Nugent is not applicable here.

execute the judgment against another entity liable for the judgment, such as an insurer, indemnitor, or solidarily liable co-defendant. Edgeworth, 993 F.2d at 53–54.

In Edgeworth, the Fifth Circuit also found that, where the debtor receives a bankruptcy discharge *before* a tort judgment is finalized, the creditor may continue to proceed *nominally* against the debtor for the purpose of establishing legal liability in order to attempt to recover the judgment award not from the debtor in violation of Section 524(a), but against another entity as permitted by Section 524(e). Id. at 54. The court's reasoning was two-fold. First, textually, "Section 524(a)(2) enjoins only suits 'to collect, recover or offset' a debt as the 'personal liability of the debtor,' a phrase that has been interpreted to exclude merely nominal liability." Id. Second, the Edgeworth court found that "it makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge." Id.

Of course, "other entity" as the term is used in Section 424(e) is not limited to liability insurers. See In re Coho Res., Inc., 345 F.3d 338, 345–46 (5th Cir. 2003) (vacating the district court's ruling, which had found the plaintiff could not proceed nominally against a debtor to recover from the debtor's indemnitor); In re Loewen Grp. Inc., No. 98-6740, 2004 WL 1853137, at *23–24 (E.D. Pa. Aug. 18, 2004) (allowing nominal suit against discharged debtor to establish debtor's liability to collect from co-defendants under the Securities Litigation Reform Act); In re McGraw, 18 B.R. 140, 143 (Bankr. W.D. Wis. 1982) (allowing claim against discharged debtor to proceed for purpose of establishing *respondeat superior* liability).

While the record is not yet fully developed on this issue, it appears that Branch's defense and liability coverage in this suit is provided by the City of Winnfield's law enforcement officers liability coverage issued by the Louisiana Municipal Risk Management Agency ("LMRMA"). It is not certain that, if the Plaintiff were to win a money judgment against Branch, she would necessarily be able to recover from the LMRMA or another entity. While the Louisiana Legislature specifically exempted the interlocal risk management agencies, such as the LMRMA, from the Louisiana Insurance Code, see La. Rev. Stat. 33:1345, such agencies do act as liability indemnitors for the municipalities and their employees. See La. Rev. Stat. 33:1341 et seq. (referring frequently throughout the statutes to the agencies as "insurance programs by local governmental subdivisions" or "group self-insurance fund[s]"). Furthermore, neither the parties nor this Court have found any case law or other legal authorities dictating whether or not Plaintiff can successfully recover some or all of a money judgment, as permitted by Section 524(e) of the Bankruptcy Code, when the "other entity" in question is an interlocal risk management agency.

Given this uncertainty, Fifth Circuit jurisprudence suggests that we not prematurely deny Plaintiff the opportunity to proceed against a defendant nominally. See In re Edgeworth, 993 F.2d at 54 n.10 ("Even if the insurance company denies coverage, the debtor will not be impermissibly burdened. If the insurance company is unwilling to defend its insured, the debtor may simply default, knowing that the judgment will be unenforceable except against the insurance company."). Consequently, we find that, at this time, Plaintiff may proceed nominally against Defendant Branch with the understanding that Plaintiff may not execute any money

Case 1:08-cv-01167-DDD-JDK   Document 324   Filed 09/29/15   Page 21 of 21 PageID #:  6873

judgment that may arise out of this case against Defendant Branch personally, <u>see</u> 11 U.S.C. § 524(a), and that Plaintiff, indeed, may not be able to recover that award from any other entity.[10]

III.     <u>Conclusion</u>

For the foregoing reasons, (1) Defendant Nugent's request for dismissal will be **DENIED**; (2) our previous ruling (Doc. 246) that Nugent is not entitled to qualified immunity will stand and his motion for summary judgment (Doc. 156) as to that issue will remain **DENIED**; and (3) Defendant Branch's motion to dismiss will be **DENIED**.

SIGNED on this 29ᵗᵉ day of September, 2015 at Alexandria, Louisiana.

DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[10] The issue, if it ever materializes, of whether Plaintiff may recover a money award from the LMRMA or another entity may be best left to a Louisiana state court at future date when the facts and circumstances are more fully developed.  Where that determination will rest is not determined here.